## Case No. 309.

### AMERICAN NICHOLSON PAVEMENT CO. v. ELIZABETH et al.

[1 Ban. & A. 439; 6 O. G. 764.][1]

Circuit Court, D. New Jersey. Sept., 1874.[2]

PATENTS FOR INVENTIONS — LIABILITY OF INFRIN-
GER — LICENSES—ROYALTIES — EVIDENCE —BUR-
DEN OF PROOF—ACCOUNTING —POWERS OF MAS-
TER—INTEREST.

1. The rules, upon which the equitable ac-
countability of an infringer is to be estimated
and ascertained, considered. In general, the in-
fringer is liable for the whole profits derived
from the infringement, unless it be shown, that
some portion of the profits were derived from
the use of instrumentalities or improvements,
not covered by the infringed patent, and which
co-operated with the patented invention in pro-
ducing the result from which the profits ac-
crued.

[Cited in Buerk v. Imhaeuser, Case No. 2,-
107.]

[See note at end of case.]

2. Under the circumstances of this case, the
onus of proving that instrumentalities or im-
provements, not covered by the infringed pat-
ent, contributed, and the extent and value to
which they contributed, to the defendants' prof-
its, rested upon the defendants; and, as they
failed to give affirmative proof thereof, before
the master, they were properly charged with
the whole amount of the profits which they de-
rived. Citing Carter v. Baker, [Case No. 2,-
472.]

3. The owner of a patent for a wooden pave-
ment, granted the exclusive right to J. & M. to
construct and lay, and license others to con-
struct and lay, the patented pavement, within
a specified territory, subject to an agreement,
that if by reason of decisions of the courts, or
otherwise, it should be found impracticable for
J. & M. to obtain contracts to be made with
them in any town or city in said territory, or
the work of constructing such pavement should
be required by law to be let under public let-
tings, open to general competition, then J. &
M. were to grant to any such town or city de-
siring to lay the same, a license so to do, upon
a license fee not to exceed thirty-one cents a
square yard, or they were to publicly authorize
any person or persons desiring to bid at such
lettings, to lay the same upon the same terms,
of which sum sixteen cents per yard were to
be made payable to the assignor of the patent
and the remainder to J. & M. A license was
granted to the complainants by J. & M., subject
to the above agreement, to construct and lay
the patented pavement in the city of Elizabeth,
the charter of which (Laws N. J. 1863, p. 156),
required that all contracts for doing work or
furnishing materials for any improvement
should be advertised for three weeks in a news-
paper printed and circulating in said city, and
should, at all times, be given to the lowest bid-
der. The charter was amended in 1870, by act
of the legislature, providing, that whenever, in
any intended improvement, it was contemplated
to use any patented process or materials, the
owners of one half of the property, in running
feet along the line of the intended improve-
ment, should remonstrate in writing against
the use of any specified patent, or petition for
the use of any specified patent, or for the use
of one, or two or more specified patents, and,

thereupon, the contract for the said work should
be awarded only in accordance with the re-
quest of such proportion of owners. The ma-
jority of the owners of property on certain of
the streets in the city of Elizabeth, petitioned
that those streets be paved by certain of the
defendants, who, thereupon, obtained contracts
therefor, and performed the work. The pave-
ment laid by them was decided, in this suit, to
be an infringement of the patent under which
the complainant's rights exist. Upon the ac-
counting before the master, under the decree
in this suit, the defendants claimed that, as,
under the charter, the complainant could not
lay the pavements which had been awarded to
defendants upon the application of the majority
of the land-owners, its profits were limited to
fifteen cents a square yard by the terms of its
license: Held, that the defendants' accountabil-
ity was not limited to the payment of the royal-
ty reserved by the license.

[See note at end of case.]

4. Where, upon an accounting before a mas-
ter, evidence is offered which is objected to, and
which the master does not exclude, the objec-
tion, that the master erred in failing to exclude
the evidence, does not properly come before the
court upon exceptions to the master's ruling.
The testimony should have been taken down,
a note made of the objections of the opposing
counsel, and the reasons for its incompetency,
stated, and its admissibility determined by the
court, on the argument, where the question
would arise, upon a motion to strike out, by
those objecting.

5. Evidence, before a master, upon an ac-
counting under a decree in a suit for infringing
a patent for wooden pavements, is incompetent
to show that there were other forms of wooden
pavement open to the public, which they might
have used, and made the profits, or some por-
tion of the profits, which had been realized in
the use of complainant's invention.

[See note at end of case.]

6. The master, upon an accounting, charged
the defendants with the gross profits, and al-
lowed them the amount of an uncollectable bal-
ance of account against the city of Plainfield,
included in the gross profits: Held, no error.

[See note at end of case.]

7. The master allowed to the defendant, the
N. J. Wood Paving Co., $7,000, as reasonable
compensation for the services of its officers; it
being shown, that the sole business of the cor-
poration, was the business which involved the
infringement of the complainant's patent, and
that its contracts in said business had produced
upward of $300,000: Held, no error.

8. The master allowed $6,107.50, for an "ex-
pense account," the items and vouchers for
which were produced before him: Held, no er-
ror.

9. The master allowed the amount of royal-
ties, reserved under a license, and paid by de-
fendants to the owners of a patent for the pave-
ment constructed by them, which is adjudged
in this suit, to infringe complainant's patent.
The infringing pavement appeared to contain a
novel feature, alleged to have been an im-
provement over complainant's pavement, and
patented. The license was to lay the pavement
upon the payment of the royalties, and the
same had been paid: Held, that as the com-
plainant failed to show that the money thus ex-
pended was unnecessary or extravagant in
amount, the court would not hold that the mas-
ter erred in allowing the payment. It seems,
that the onus was upon the complainant to
show that the improvement did not contribute,
so much as the amount of the royalties, toward
the aggregate profits of the enterprise.

[Cited in La Baw v. Hawkins, Case No. 7,-
961.]

[1][Reported by Hubert A. Banning, Esq., and
Henry Arden, Esq., and here reprinted by per-
mission.]

[2][Affirmed by supreme court as to one defend-
ant, but reversed as to the other two. City of
Elizabeth v. American Nicholson Pavement Co.,
97 U. S. 126.]

10. The complainants are entitled to interest upon the profits, only from the date of the final decree. Citing Mowry v. Whitney, 14 Wall. [81 U. S.] 653.

[Cited in Webster v. New Brunswick Carpet Co., Case No. 17,338.]

[In equity. Bill by the American Nicholson Pavement Company against the city of Elizabeth, N. J., George W. Tubbs, and the New Jersey Wood Paving Company, for an injunction and an account for the alleged infringement of patent No. 11,491. Motion for provisional injunction was denied, provided defendants give bond for a stated sum. American Nicholson Pavement Co. v. City of Elizabeth, Case No. 312. Upon the merits a decree was entered for complainant, (Id. 311,) and upon exceptions to the master's report a decree was entered for complainant for a specific amount. Defendants appealed to the supreme court, where this decree was reversed as to the city of Elizabeth and George W. Tubbs, but affirmed as to the New Jersey Wood Paving Company, the other defendant. City of Elizabeth v. American Nicholson Pavement Co., 97 U. S. 126.

[For a report of hearing upon an application to determine the amount of security to be given on allowance of appeal to the supreme court, see Case No. 310.]

C. A. Seward, for complainant.
Keller & Blake, for defendants.

NIXON, District Judge. The case comes up on exceptions, filed by both parties, to the report of the master. By the decree of the court, entered March 26, 1872, the defendants were held to have infringed the letters patent of complainant, by making, using, and vending, in the city of Elizabeth, wooden pavements, containing the improvements described therein, and recited in the first and second claims, and were ordered to account for the damages, or use and profits, in consequence of said infringement.

A reference was made to William I. Magie, Esq., of Elizabeth, to take and report such account. He has reported substantially, that the defendant, the New Jersey Wood Pavement Company, has laid 72,042 8-10 square yards of the Brocklebank and Trainer pavement, as follows:

| | | |
|---|---|---|
| In the city of Plainfield | 2,700 | square yards. |
| In the city of Elizabeth: | | |
| Grove and Garden streets.......... | 10,148 4-10 | " |
| Newark avenue.... | 30,827 3-10 | " |
| Sherman avenue... | 4,958 1-10 | " |
| Ninth [North ave.][3] avenue........... | 14,957 | " |
| Grier avenue....... | 3,449 | " |
| Sherman avenue, outside of city limits............ | 5,003 | " |
| Total.......... | 72,042 8-10 | " |

[3] From 6 O. G. 765.

That it was entitled to receive, therefor, as the contract price for the work, the gross sum of $346,934.83; that it had, in fact, received from the city of Elizabeth $310,198.29; from the city of Plainfield $10,834.69, and in land, for paving Sherman avenue, outside of the city limits, taken at the contract price, of the value of $22,513.50; that the gross profits of the defendants upon all the work, after deducting the actual cost of materials and labor (except such as, having been omitted in the account, were claimed as afterward stated), and assuming that the whole contract price of the Plainfield pavement could be collected, and that the lands given in payment of the Sherman avenue extension were worth the contract price—was $123,610.78; that from these gross profits, admitted by the defendants, they claimed certain deductions, stated by the master, with his finding therein, as follows:

1. For profits on the various materials and the labor used and employed in the construction of said pavement, $31,611.92; which he refused to allow.

2. For losses, arising from the impossibility of collecting the contract price of the Plainfield pavement, $3,388.35; which he allowed.

3. For salaries of George W. Tubbs, William W. Crane, and Augustus C. Kellogg, officers of the defendant, the New Jersey Wood Paving Company, $14,000; of which, he allowed $7,000, the amount of said salaries for one year, during which the work was done.

4. For the rent of the premises, occupied by the defendant, $6,000; of which he found and allowed $3000, being the rent for one year, during the time the said work was done.

5. For wood, not charged in the cost of the work, and deemed to have been used as fuel in doing the same, $570.93; which he allowed.

6. For $2,675.09, claimed to have been expended, in erecting a dock on ground leased to said defendants; which he refused to allow.

7. For $550, for red sand, and $4,237.20, for levelling sand, claimed to have been used as materials in said work, and not deducted in making up the foregoing account of gross profits; which he allowed.

8. For machinery, claimed to be procured by defendant, and adapted to said work and then on hand, and of no value, $4,893.22; which he allowed.

9. For an expense account, not included in the cost of labor and materials, entering into said account of gross profits; but claimed to be properly chargeable thereto, $6,107.50; which he allowed.

10. For $25,000, claimed to have been paid for an interest in the patent of Brocklebank & Trainer; which he refused to allow.

11. For an account called a "loss and gain account," not included in the statement of gross profits, $156.76; which was allowed.

12. For profits claimed by said defendants upon other work, allowed to have been included in said contracts, $6,572.75; which he refused to allow.

13. For $13,868.42, the amount claimed to have been paid as royalty or license fee for laying the said pavements under the Brocklebank & Trainer patent; which he allowed.

14. For $15,241.33, the sum claimed to have been paid by the defendants to stockholders and others, as a rebate upon pavement laid in front of their respective lands; which he refused to allow.

15. And for probable loss on the sale of lands, taken for the work done on the extension of Sherman avenue, the sum of $5,003; which he allowed.

He further reported, that the aggregate amount of the allowances made by the master on these claims, was $48,775.38, leaving the net profits of the defendants on said work $74,835.40; upon which sum, the complainant was allowed interest, at the rate of seven per cent, from the 29th of August, 1870, the average date of the payments made by the city of Elizabeth, to the date of the report, amounting to $16,588.51, making for net profits and interest the sum of $91,-423.91.

He further reported, that the counsel for the complainant conceded before him, that, inasmuch as the bill had been filed in the cause, prior to the passage of the act of July 8, 1870, authorizing damages as well as profits, to be assessed by the master, in equity cases, no damages could be assessed; and, that he had restricted his inquiry, solely, to the gains and profits of the defendants in the infringement specified in the decree.

To the report of the master, the complainant has filed six exceptions, and the defendants twelve; but, before these are considered, it is important to ascertain, if we can, the principle on which the complainant's profits for the illegal use of his patent are to be estimated. This obviously depends upon the character of the patented invention, and upon the mode in which the owner chooses to allow the public to use his monopoly, and upon the methods of procedure in the tribunal to which he appeals for redress. The subject occupied the attention of the supreme court in Seymour v. McCormick, 16 How. [57 U. S.] 489, and the difficulty in laying down a rule, applicable to all cases, was adverted to. Mr. Justice Grier, in delivering the opinion of the court --the case being a suit at law--observed, that: "It must be apparent to the most superficial observer * * * that there cannot, in the nature of things, be any one rule of damages, which will equally apply to all cases. The mode of ascertaining actual damages must necessarily depend on the peculiar nature of the monopoly granted. A man who invents or discovers a new composition of matter, such as vulcanized india rubber, or a valuable medicine, may find his profit to consist in a close monopoly, forbidding any one to compete with him in the market, the patentee himself being able to supply the whole demand, at his own price. If he should grant licenses to all who might desire to manufacture his composition, mutual competition might destroy the value of each license. * * * If any person could use the invention or discovery, by paying what a jury might suppose to be the fair value of a license, it is plain that competition would destroy the whole value of the monopoly. In such cases, the profit of the infringer may be the only criterion of the actual damage of the patentee. But one who invents some improvement in the machinery of a mill, could not claim that the profits of the whole mill should be the measure of damages for the use of his improvement. And where the profit of the patentee consists neither in the exclusive use of the thing invented or discovered, nor in the monopoly of making it for others to use, it is evident that this rule could not apply. * * * Where an inventor finds it profitable to exercise his monopoly by selling licenses to make or use his improvement, he has himself fixed the average of his actual damage, when his invention has been used without his license. If he claims anything above that amount, he is bound to substantiate his claim, by clear and distinct evidence. When he has himself established the market value of his improvement, as separate and distinct from the other machinery with which it is connected, he can have no claim in justice or equity to make the profits of the whole machine the measure of his demand. It is only where, from the peculiar circumstances of the case, no other rule can be found, that the defendant's profits become the criterion of the plaintiff's loss." But this is when the proceedings are at law, where the inquiry is about the actual damages, sustained by the patentee, from the infringement. Here we are in equity, and the question which concerns us is: For what profits should the infringer account for the unauthorized use of the invention?

It may be answered generally, that the patentee is entitled to a just compensation for the injury which he has sustained from the invasion of his rights. How this is to be ascertained, depends upon the facts and circumstances of each case. If the owner's profit consists in having a license fee paid to him, by all who use the invention, the amount of the license is his profit; and when that is paid, the injury done by the use without a license, is satisfied. If it consist in the exclusive use of the thing patented, or in the monopoly of making it for others to use, additional considerations are involved. We are then to inquire: What is the character of the invention? Is it a new machine, or manufacture, or composition of matter, whose entire value and usefulness result from the mechanism, combination, or constituents, which the genius of the patentee has originated, arranged, or produced? Or is it a

mere addition to, or improvement of, an existing machine, manufacture, or process, rendering them more valuable and profitable, but not necessary to their use, and which may be used in a less profitable way, without the addition or improvement? In other words, when profits have gone into an infringer's pocket, he is regarded as the holder of property not belonging to him, but which he must restore to the rightful owner. If the invention infringed cover the entire machine, manufacture, or combination used by the infringer, then the whole profits should go to the patentee. If it cover only a part, and there are other and different elements in the organism, contributing to make up the aggregate profits, then, only such proportion should go to him, as has sprung from his contribution toward the value of the whole.

In the case before us, the complainant is the licensee of the owners of Nicholson's extended patent. It has "the sole and exclusive right and license to construct and lay, and to authorize others to construct and lay, the (Nicholson) patented pavement, within the state of New Jersey, except Jersey City, during the entire extended term of said patent." It pays for the license a royalty of sixteen cents for every square yard of the pavement which shall be laid in the said territory, within thirty days after the completion of such pavement. Its profits arise from its exclusive use of the invention; from the monopoly, which it has, of constructing, or bargaining with others to construct, the pavement, upon agreed terms, anywhere in the state; except in certain cases, to which reference will hereafter be made, and in which it is bound, by covenants with its grantor, to grant a license for laying the pavement in a sum not exceeding thirty-one cents a square yard. That exclusive use or monopoly of the complainant has been interfered with by the defendants. They have laid its patented combination in the streets of Elizabeth, without its consent. The rule in equity seems to be settled, under such circumstances, that the measure of damages, due to the complainant, is the amount of profits made by the infringers, unless, as has been intimated, some portion of the profits have been derived from the use of constituents of the combination, not the property of the patentee, and, for the use of which, he is not entitled to compensation.

What, then, is the Nicholson pavement? What is the owner of the patent authorized to demand for the infringement of its distinguishing characteristics? It was held at the final hearing, that the defendants had infringed the first and second claims, to wit: 1. A continuous foundation or support, directly upon the roadway, having arranged thereon a series of blocks, with parallel sides, endwise in rows, so as to leave a continuous narrow groove, or channel way, between each row, and filling said grooves or channel ways with broken stone, gravel and tar, or other materials. 2. The formation of a pavement, by laying a foundation directly upon the roadway, and then employing two sets of blocks, one a principal set, that shall form the under surface of the pavement when completed, and an auxiliary set of blocks or strips of board, which shall form no part of the surface, but determine the width of the groove between the principal blocks, and also the filling of said groove, when so formed, with broken stone, gravel and tar, or other like material. In the opinion, sustaining the novelty of the invention, American Nicholson Pavement Co. v. City of Elizabeth, [Case No. 311,] it was observed: "The complainant's patent is doubtless for a combination. The several parts that make up the structure, are: (1) A continuous foundation directly upon the roadway. (2) A series of blocks, with parallel sides, standing endwise in rows, that form the under surface of the pavement. (3) An auxiliary set of blocks or strips of board, which form no part of the surface, but determine the width of the grooves between the principal blocks. (4) The filling of the grooves, when so formed, between the principal blocks, with broken stone, gravel and tar, or other like material. It is not claimed that any one of these parts is new, but that, in their combination, they produce a new and useful result."

Now, what had the defendants done? In what did their infringement consist? They did not, as it is conceded they were authorized to do, take a portion of the ingredients or elements which constituted the combination, and add to them other ingredients or elements, that were newly discovered, and which were not equivalent for those left out, thus producing a new combination substantially different from the complainant's. They took the combination as Nicholson had formed it. They seized the whole of his invention. There is nothing in his patent, which is not contained in the Brocklebank & Trainer patent. But they did more than this. They added a new feature to the Nicholson combination. They rabbeted the blocks on one or both sides, in a dovetail or vertical form, and beveled the strips to suit the rabbets; which addition, it is claimed, made a mechanically different structure, and was an improvement, in that it guarded against the displacement of the strips or short blocks, and distributed the pressure upon the pavement over a larger surface.

We are inclined to believe that there is a good foundation for this claim of the defendants, whether we look for it in the evidence of the case, or, in the well-ascertained principles of mechanics; and that the Brocklebank & Trainer patent, by this addition, has improved upon the Nicholson combination.

We are then brought to the inquiry: What effect should the improvement of the defendants', have upon the question of com-

plainant's profits? It undoubtedly added to the expense of laying the pavement, and to that extent, diminished the profits of the whole work. If it had lessened the cost, it is quite evident that the amount, thus saved, ought to be credited to the improvement. Upon the same principle, why should not the sum expended, in consequence of the increased labor of the addition, be charged to it?

But without troubling ourselves further with this aspect of the case, it seems to us that the relative value of the defendants' addition to the complainant's invention, ought to have been the subject matter of evidence before the master, although neither party offered specific testimony in regard to it. And the burden of proof was obviously on the defendants. They had been adjudged infringers. They had appropriated the complainant's invention, and realized, from its use, large profits. Their books of account were produced, and exhibited the gross amount. From this, they asked the master to make deductions, and it was for them to show what deductions should be allowed. They had caused a mingling and a confusion of rights, by unlawfully adding an improvement of their own to the property of the complainant, and, it was their duty, and not the complainant's, to prove what proportion of the profits, if any, ought to be credited to the changes which they had made in the combination of the complainants. This proposition was warmly contested by the able counsel of the defendants, in the argument; but it seems to the court so clear, that it hardly needs authority to support it. If any be required, it will be found in Carter v. Baker, [Case No. 2,472,] where the learned judge of the ninth circuit, in charging the jury upon this precise question, said: "If the defendants have improved their machine, and if any of the profits are properly credited to defendants' improvement, they do not belong to the plaintiffs; but as the defendants have wrongfully connected the plaintiffs' improvement with their own, and they caused the confusion of rights, if any portion of the profits are properly to be credited to the defendants' improvements, the burden rests upon them to show affirmatively that fact, and how much of those profits ought to be credited to this improvement, and deducted from the profits of the sale of the whole machine as improved." As no affirmative proof was offered, the master made no apportionment of the profits to the defendants, for any speculative value added to the invention by Brocklebank & Trainer, unless we regard in that light the $13,868 42-100, claimed by them, and allowed by the master, for the royalty, or license fee, paid for the use of that patent in laying the pavements, and to which we shall more particularly refer, when we come to consider the exceptions to his report. But incidental reference has already been made to another fact in

the case, which the counsel for the defendants claim, as a controlling one, in the estimation of the complainant's profits: to wit, that the complainant is limited, by the terms of its license, to the compensation or royalty of thirty-one cents per square yard; fifteen of which is payable to it, and sixteen to the owners of the extended patent.

It appears from the exhibits and testimony that Nicholson, the owner of the original patent, died January 6, 1868, and that George T. Bigelow was appointed the administrator of his estate; that the said Bigelow, as administrator, applied for and procured an extension of the patent for seven years from August 8, 1868, and conveyed the one third of the extended term to Edwin C. Larned and Stephen A. Goodwin; that Bigelow, Larned and Goodwin, entered into an agreement with Charles E. Jenkins and W. T. B. Milliken, on the 14th of August, 1868, wherein they granted to the said Jenkins and Milliken, the sole and exclusive right and license to construct and lay, or to authorize and license others to construct and lay, the patented pavement, in all the cities, towns and places of New Jersey, except Jersey City, upon certain terms, conditions and stipulations therein contained, one of which was as follows: "If it shall, by reason of decisions of the courts or otherwise, be found impracticable for the said parties of the second part to obtain contracts for laying said pavement, in any town or city in said territory, to be made with such parties of the second part; or the work of constructing such pavement is required by law to be let under public lettings, open to general competition, then the said parties of the second part agree, that they will grant to any such town or city desiring to lay the same, a license so to do, upon a license fee not to exceed the sum of thirty-one cents a square yard; or will publicly authorize any person or persons desiring to bid at such lettings to lay the same upon the same terms as above stated; of which sum, the sum of sixteen cents shall in every case be made payable to the said parties of the first part, as hereinbefore provided; but, for the fulfilment of any such contracts or licenses made or granted, as in this clause provided, the said parties of the second part shall be in no wise responsible."

The complainant's title was derived from Jenkins and Milliken, by license, dated September 5, 1868, and the license was taken upon, and subject to, the same terms, conditions, and stipulations, on which its grantors held the patent. By the 123d section of the act to revise and amend the charter of the city of Elizabeth, approved March 4, 1863 (Laws of N. J., p. 156,) it was enacted that all contracts for doing work or furnishing materials for any improvement provided under this act, exceeding $100, shall be advertised for three weeks in a newspaper printed and circulating in the city, and shall

at all times be given to the lowest bidder. A supplement was passed February 9, 1870, which practically repealed the foregoing section, and was to the effect that, whenever the city council should determine to cause any improvement to be made, which contemplates the use of any patented process or materials, and the owners of one half of the property, in running feet, along the line of the intended improvement, should remonstrate in writing against the use of any specified patent, or petition for the use of any specified patent, or for the use of one, of two or more specified patents, in making such improvement, the city council should award the contract for the said work, only in accordance with the request of such proportion of owners. This was followed shortly afterward by the act to incorporate the New Jersey Wood Paving Company, approved March 17, 1870, in which George W. Tubbs, William W. Crane, A. C. Kellogg, and nine other named gentlemen, were constituted directors of the corporation, and authorized in their corporate name to construct and lay wooden pavements, and to purchase all materials, patents, and patent rights, that might be deemed of advantage to their business. By the 2d section, the capital stock was limited to $250,000, but the company was prohibited from commencing business until $10,000 were subscribed and paid in in cash. This little inconvenience was obviated, however, by the 4th section, in which the directors were authorized, in behalf of the company, to receive any patents or patent rights suitable for its purpose, at a valuation to be agreed upon, and in lieu of cash subscriptions for stock. The objects for which the company was formed may be readily inferred from the method of its organization. Mr. Tubbs, the president, on his cross-examination, at the final accounting, folio 243, tells the story as follows: "The nominal stock of the company was $250,000. There never was anything paid in, in money, by the stockholders. The stock was issued, as paid up stock, for the license under the Brocklebank & Trainer patent, which was owned by Crane, myself, and A. C. Kellogg, under the firm of Crane, Tubbs & Co. The license covered New Jersey. I think all the stock was issued for the license. One half was transferred back to the company as working capital. I think the stock was issued to me and by me transferred. Of the other one half of the stock, issued for the license, the largest part went to Crane, Tubbs & Co. I think there were ten shares issued to each of the directors. Crane and myself received them as such directors; the shares were $100 each, the twelve directors had 120 shares, and the balance of the 1,250 shares went to Tubbs & Co. Those directors who did not serve, did not take their stock."

It does not distinctly appear, how many of the twelve directors accepted the stock thus issued, but, as the Legislature of the State, at the next session (Laws N. J. 1871, p. 312), reduced the number to seven, it is quite probable that some of the gentlemen declined or failed to accept. In any event, all that there was, or is, in the New Jersey Wood Paving Company, except the few shares of stock thus issued to the directors, belonged to Tubbs, Crane & Co., to wit, a license to use the Brocklebank & Trainer patent in laying wooden pavements in New Jersey, upon the payment of a royalty to the patentees of twenty cents for each square yard.

Previous to the time when the charter for the New Jersey Wood Paving Company was obtained, the complainant had entered into several agreements with the city of Elizabeth for laying the Nicholson pavement, one as early as December 4, 1868, for upward of 9,000 square yards on Broad street; another, July 1, 1869, for 1,620 square yards on Grove street; another, July 14, 1869, for 4,294 square yards on Cherry street, and another November 15th of the same year, for 10,654 square yards on Grier avenue. Other contracts were made during 1870 and 1871, eight in number, upon as many different streets or avenues, measuring upward of 100,000 square yards. As these continued through a course of years, and largely outnumbered the contracts executed with the defendants, it must be assumed that other reasons than dissatisfaction with the Nicholson pavement constrained the city to enter into the latter, and these reasons are probably founded in the provisions of the supplement of February 9, 1870, which became a law, before any contract was made by the city, to lay the Brocklebank & Trainer pavement.

The first of these was entered into with George W. Tubbs, February 18, 1870, for the improvement of Garden street; the second, on March 18, 1870, for Newark avenue; the third, on April 20, 1870, for Grove street; the fourth, with the New Jersey Wood Paving Company, on July 12, 1870, for Ninth avenue; and the fifth and sixth, with George W. Tubbs, in the month of September, for Sherman and Grier avenues. The owners of half the property upon these streets and avenues had petitioned the common council of the city to contract for the Brocklebank & Trainer pavement, either because they preferred it, or were interested in it, or because the New Jersey Wood Paving Company, who controlled it, had agreed to refund to these gentlemen a portion of the money which should be paid by the taxpayers of the city for having it laid. On this point, the testimony of Geo. W. Tubbs before the master is quite suggestive. He says, p. 59, fol. 235: "There is an item of abatement to directors, amounting to $14,709 66-100. That means, this: when the company was formed, and we were getting the charter, it was agreed with the parties who got the charter, that when we paved in front of their property they should have the bene-

fit of fifty cents a yard. That was deducted out, and thus this item arose. That amount was paid back to them." Statements of that sort rendered it unnecessary for the complainants to show, at whose instance, and for what purpose, the supplement was passed. Such is a detail of the facts of the situation, as derived from the evidence in the case. It is insisted by the counsel of the defendants, that, while this legislation existed, the complainant could not lay the pavements, which had been awarded to the defendants on the application of the majority of land-owners, and hence, that its profits were limited to fifteen cents a square yard by the express terms of its license. Neither branch of this proposition is true in the sense in which it is propounded. In the first place, a preliminary suggestion is, that it would not be quite becoming a court of equity to allow the defendants to profit by their own wrong, and it is that which they ask the court to do.

The improvement of certain streets, in the city of Elizabeth, was deemed desirable, and steps were taken to accomplish it. The Legislature of the state was applied to by certain gentlemen, who obtained the enactment of a law, that practically shut up the city to award the work to the licensees of the Brocklebank & Trainer patent; for, by its provisions, a majority of the land owners controlled the selection, and it was made their interest to demand the laying of that pavement, by having refunded to them a portion of the profits derived from the whole work. Large profits were realized by the licensees from these contracts, but, realized from the use of the complainant's invention. Will the court allow the bulk of these profits to be retained by the infringers, because the complainant could not be a competitor for the work, when it so clearly appears, that whatever disabilities existed in regard to competition, were produced by the infringers themselves?

Again, it is assumed, that the complainant could not lay these pavements, because the property owners had asked for the use of defendants,' and not the complainant's, patent. But is it altogether sure that the Brocklebank & Trainer patent would have been preferred, if it had not been, in fact, the Nicholson invention, with something added? And shall the defendants be allowed to accumulate large gains by using complainant's property, and afterwards, to retain them, upon the plea that complainant could not have made them? Is not this raising a new and false standard for the measure of complainant's damages? In estimating its profits, is it not changing the inquiry from what the defendants actually made, into what the complainant could or could not make? And is not this as remote from the real question, as the exploded inquisition into what the defendants might or might not have made? But, without following these suggestions to their ultimate results, let us look a little closer into the matter, and ascertain whether any contingency arose, which limited the licensees of the Nicholson pavement to the sum of fifteen cents per square yard. Upon what conditions did the licensees, agree with the owner of the patent, to permit third parties to lay the pavement for thirty-one cents per square yard? These were two in number: (1) Where, by reason of the decision of the courts, or otherwise, it was found impracticable for the licensees to obtain contracts for laying it in any town or city of New Jersey; and (2) where the work of constructing the pavement was required by law to be let under public lettings, and open to general competition; neither of which existed in the present case.

Conclusive proof that it had not been found impracticable, by reason of any decisions of the courts or otherwise, for the complainant to obtain contracts to lay the Nicholson pavement in Elizabeth, is discovered in the fact that it entered into a number of contracts for laying such pavement, both before and after the dates of the contracts with the defendants. And after the supplement of February 9, 1870, there could be no public lettings, open to general competition, for street improvements, because that act concluded the city in regard to the patents to be used, by the expressed preference of a majority of land owners on the line of the street, and no one could bid for the work, except the owners or licensees of the particular patent, which the property holders had selected. But let it be admitted that these contingencies in fact existed, what, then, did the licensees agree to do? These two things: (1) "To grant to any town or city, desiring to lay the Nicholson pavement, a license so to do, upon a license fee not to exceed thirty-one cents per square yard." (2) "To publicly authorize any person or persons, desiring to bid at public lettings, to lay the Nicholson pavement" upon the same terms.

In reference to the first, did the city of Elizabeth ever express a desire to lay this pavement upon these streets? Was it not estopped, by the provisions of the law, from having a voice in the matter? Did not the 2d section of the act of 1870, make it the duty of its mayor to veto every contract that the city council should award, which was not in strict accordance with the expressed wishes of a majority of the property owners, in regard to the use of a specified patent? In reference to the second, there is no proof of any public lettings, nor of the existence of persons desiring to bid at them. There could be none, "open to general competition," in any proper sense, after the supplement of 1870; and, if there had been, no bids could have been received and considered for these streets, from persons who proposed to use the complainant's patent. But again, this covenant was between the owner and the licensees of the Nicholson extended patent,

and was imposed upon the latter for the benefit of the former. The owner's profit was a royalty of sixteen cents, for every square yard of pavement, laid; and it was their interest to secure the laying of as many square yards as possible, and to guard against the temptation, which such methods of compensation suggest, of putting down a small quantity of pavement, at a large profit, rather than a large quantity at a small profit.

The city of Elizabeth, under the circumstances mentioned in the covenant, could have required the complainant to lay the pavement, at the price limited therein, but did not. These defendants, under the like contingencies, could have bargained to use the complainant's patent, without being guilty of infringement, upon the payment of the prescribed consideration, but did not. On the contrary, in consequence of owning the property on certain streets, or from making it the interest of other property owners, by secret agreements, to pay them a portion of the profits, they secured a request for the laying of the Brocklebank & Trainer pavement, and entirely ignored any arrangements by which the taxpayers of the city might receive the economical advantages resulting to the public, from the terms on which the complainant held the Nicholson patent. Shall it now be said, that a court of equity ought to allow them to invoke, for their protection and immunity against the surrender of their unlawful gains, a covenant between other parties, executed for other purposes, and from the benefit of which they took all available means to exclude themselves and the city of Elizabeth?

It results from the foregoing views, and the court holds: 1. That if the defendants desired an allowance from their ascertained profits, for the benefits contributed to the complainant's invention, by the Brocklebank & Trainer addition, the burden of proof was on them to show to the master, approximately, at least, the extent of the advantages which were added, and the proportion of the profits which were made, by their improvement of the Nicholson combination. 2. That at this stage of the proceedings, where the only question before the master was the one of accounting for the profits realized from the infringement of the complainant's patent, there was no principle of justice or equity that limited the accountability of the defendants to the payment of certain royalties, which, under other circumstances, the complainant might have been compelled to accept as the proper measure of its loss.

We are now brought to the consideration of the exceptions filed to the findings of the master. Before looking at them, it is proper to premise, that there is nothing in the case, which authorizes the court, if it had the power, and were so disposed, to visit upon the defendants any consequences in the nature of a penalty. They were not wanton infringers. They were proceeding under an authority, equal on its face, to that of the complainant. to wit, a patent from the government of the United States, and they had a right to assume, that it was valid until a competent tribunal decided to the contrary. They are not to be treated like another class of infringers—unhappily too large—who, without a pretext of right, seize upon the inventions or the property of others, and trust to the ignorance, or the poverty, or the kindheartedness of the owners, for immunity in retaining their piratical gains. All that the defendants should be required to do, in the present case, is to simply restore to the complainant the money, which the use of its property had enabled them to make.

We will first advert to the exceptions of the complainant.

1. The first is, that the master erred, in not excluding certain evidence, for the reasons assigned, when it was offered. The question which the counsel of the complainant seeks to raise, does not properly come up by exceptions to the master's ruling. His course was, in accordance with the prevailing practice in the circuits, to wit, taking down the testimony; noting the objections of the opposing counsel, and the reasons stated for its incompetency; leaving its admissibility to be determined by the court, on the argument, where the question would arise, on a motion to strike out, by those objecting. Whilst, therefore, we are not willing to say that the exception is well taken, and that the master erred in admitting the testimony and noting the objections, we have no hesitation in holding that, under the reference, the evidence was incompetent. It was offered by the defendants, to show that there were other forms of wooden pavement open to the public, which they might have used, and made the profits, or some portion of the profits, which had been realized in the use of the complainant's invention. It is a sufficient reply to such offer, to observe, that the defendants preferred and used the complainant's property, and made their gains therefrom; and that these gains no less belong to the complainant, because they might have realized other gains by the use of lawful methods.

2. The second objection is not well taken, and seems to misapprehend the action of the master. It alleges that he erred, in "allowing for losses arising from the impossibility of collecting the contract price of the Plainfield pavement, the sum of $3,388.35, such loss being of prospective profits only." The master, in the account, charged the defendants with the whole sum to be received for laying said pavement, $14,223.14. He states, in his report, that the gross profits, charged to defendants, amounted to $123,-610.78, only "by assuming that the whole contract price of the Plainfield pavement could be collected." The proof was (fol. 315), that they received on account of said contract $9,273.24 in cash, and $1,561.45 in mate-

rials not used, making the aggregate of $10,-834.69, and that the residue of the consideration could not be collected. The actual loss, therefore, to the defendants, upon this mode of accounting, was the difference between these amounts, to wit, $3,388.35, which sum the master properly deducted.

3. The third exception objects to the master's allowance of $7,000 to the officers of the New Jersey Wood Paving Company, as reasonable compensation for their services during the year in which the pavements were laid. The six contracts of the defendants, were assigned to, and completed in the name of The New Jersey Wood Paving Company, of which corporation, George W. Tubbs was president, and A. C. Kellogg and William W. Crane were successively treasurers, all of whom acted as general superintendents in the work of laying the pavements. The board of directors voted to these gentlemen, $7,000 a year, as salaries during the time that they held the offices, and performed the labor of superintendence. As the company was engaged in very little other work while these pavements were being laid, the defendants claimed that two years' salary, amounting to $14,000, was only a reasonable allowance to these officers, and that the sum ought to be deducted from the profits which their skill and vigilance had helped to earn. The master reported that all the work was completed within a year, and that one year's salary of $7,000 was a proper compensation. The complainant insists that nothing should be allowed to infringers, from the profits, for personal services rendered, and quotes Rubber Co. v. Goodyear, 9 Wall. [76 U. S.] 788, to sustain this view of the law. But, an examination of that case, shows that, the contrary was held. In making up the account, the master there allowed, as deductions from the profits, "the usual salaries of the managing officers," but "refused to allow the extraordinary salaries, which, it appeared by the books, had been paid—being satisfied they were dividends of profit under another name, and put in that guise for concealment and delusion." His action was approved by the court, both as to the allowance and disallowance; and the principle is to be extracted from that decision, is, that while courts will rebuke all attempts on the part of infringers to cover up or absorb gains and profits, under the names of salary, or compensation for personal service, yet, in those cases where defendants have not forfeited the favor of the court, by their naked piracy of the rights of others, a reasonable allowance will be made to them from the profits, for their care and skill in directing the execution of the work. As, in the present case, the work was of such magnitude and character that the contracts produced the gross sum of upwards of $300,000, the amount of $7,000 would not seem to be an unusual, or extraordinary remuneration to

three competent men for conducting and superintending it.

4. The fourth exception is to the allowance of $6,107.50 for "an expense account," not included in the cost of labor and materials. The allegation, is that, there was no evidence before the master as to the constitution of such amount, or as to the nature of the application or expenditure thereof, or that the same was paid in good faith by the defendants, to other persons, for expenses. The testimony of S. S. Morse, the secretary of the company (fol. 303), was, that this charge was made up by numerous expense bills, for various items that could not be classified, and, therefore, went into the general expense account. He added: "I have an account of the various items, here, and the vouchers." The only cross-examination, on this subject, to which he was subjected, was at folio 341, where, he was asked to explain what he meant by expense account, and replied: "I mean for salaries and such things that I could not class and charge to a particular job." It must be assumed, under these circumstances, that the master was satisfied from an examination into the accounts and vouchers produced, that there was a proper foundation for the charge.

5. The fifth exception complains of the master for allowing $156 76-100 for an account called "a loss and gain account." Such a vague charge demands explanation and none is given. It first appears, at the close of the accounting, in exhibit G, of defendants. We have examined the testimony, and can nowhere find an allusion to, or explanation of, the item. As it seems to be unsupported by evidence, the exception is sustained.

6. The last exception by the complainant is that the master erred in deducting $13,-868.42 as royalty, or license fee, paid for laying 69,342 square yards of pavement, under the Brocklebank & Trainer patent. Two reasons are assigned for objecting to the allowance: (1) Because, as to said sum, the defendants have no title as against the complainant. (2) Because the evidence before the master, affirmatively showed, that the same was not paid in good faith by the defendants to other persons for expenses. The defendants were the licensees of Brocklebank & Trainer, and had agreed to give to them, as the owners of the patent, a royalty of twenty cents, for every square yard of pavement, put down. The quantity paid [laid][3] amounted to the above sum, and Mr. Tubbs testified, that it was paid to Brocklebank & Trainer. Mr. Morse, on the other hand, says that the amount was in fact paid by the company, but that $729.80 went to Michael Doyle, and the balance to Captain Tubbs. It does not concern the present inquiry, to whom the money was paid, if it was, in truth, a legitimate expense, to be

[From 6 O. G. 771.]

deducted, from the profits. The master makes the allowance, and gives his reason for it in the following words: "Defendant further claimed that there should be allowed, and deducted from the gross profits, $13,868.42, claimed to have been paid as royalty or license fee for laying 69,342 square yards of said pavement, under the Brocklebank & Trainer patent. It appearing that said pavement, decreed in the cause to be an infringement of plaintiff's patent, contains a novel feature, alleged to have been an improvement, and patented, and that the license to lay the same was upon the payment of such license fee, and which has been paid, I find and allow the said sum etc., as a proper deduction."

We have already considered the question, whether the master ought to have made an allowance to the defendants as the licensees of the Brocklebank & Trainer patent, for their addition to the Nicholson invention, and have held that, in the absence of affirmative proof, on the part of the defendants, of its value, he was justified in giving no credit for such addition. But here we have a different question. The contracts on which the profits were realized, were for the use of the Brocklebank & Trainer pavement. No other could be put down. The defendants had bargained to pay the above sum to its owners, whenever they used the patent, and, so far as it appears, had made the bargain in good faith. It was an expense necessary to be incurred, in order to fulfil their contracts. They agreed to pay, and did in fact pay, twenty cents a square yard for the Brocklebank & Trainer improvement. Perhaps the improvement did not contribute, so much as that, towards the aggregate profits of the enterprise. It is difficult to apportion in such cases. But, if it did not, is not the burden of proof here shifted, and ought not the complainant, to have shown affirmatively, that the expenditure, thus made, was unnecessary, or extravagant in amount? This was evidently the view which the master took, and, in default of such proof, we are not prepared to affirm that he erred in allowing the payment as a deduction from the profits.

We have now reached the defendants' exceptions, but, as the principles upon which most of them rest, have been incidentally discussed in the foregoing opinion, it will not be necessary to allude to them in detail. It is sufficient to say, that they have all been carefully considered, and, in our judgment, must all be overruled, except the 9th, in regard to the allowance of interest by the master. Whatever might have been the opinion of the court, as to their action in this respect, if the question had been open, we are constrained to say, on the authority of Mowry v. Whitney, 14 Wall. [81 U. S.] 653, that the case before us, is not one where interest should be allowed, until after the final decree. However much that case differs from this, in regard to the contribution to the aggregate profits, by the use of constituents in the infringing process, not belonging to the patentee who complained of the infringement, it is the same in regard to the defendants' liability to interest on the profits; and the reasons assigned by the supreme court for sustaining the exceptions to the master's report, allowing interest there, are precisely applicable here. Mr. Justice Strong delivered the opinion, in the conclusion of which he said: "The defendant should not have been charged with interest before the final decree. The profits which are recoverable against an infringer of a patent, are, in fact, a compensation for the injury the patentee has sustained from the invasion of his right. They are the measure of his damages. Though called profits, they are really damages, and unliquidated, until the decree is made. Interest is not generally allowable upon unliquidated damages. We will not say, that in no possible case can interest be allowed. It is enough that the case in hand does not justify such an allowance. The defendant manufactured the wheels, of which the complaint is made, under the patent granted to him in 1861. His infringement of the complainant's patent was not wanton. He had before him the judgment of the patent office, that his process was not an invasion of the patent granted to the complainant, and though this does not protect him against responsibility for damage, it ought to relieve him from liability to interest on profit." There must be a decree for the complainant, for the amount reported due by the master, to wit; $91,423.91, after first deducting therefrom $16,588.51, the interest allowed by him, and adding thereto $156.76, which he improperly deducted from the acknowledged gross profits.

[NOTE. An appeal was taken by the defendants to the supreme court, where the decree of the circuit court was affirmed so far as it affected the New Jersey Wood Paving Company, but reversed as to the other defendants, the city of Elizabeth and George W. Tubbs. The court held that a decree for an injunction should have been rendered to prevent them from constructing such pavement during the term of the patent, but that they could not be held accountable for profits, this bill having been filed before the passage of the act of July 8, 1870, (16 Stat. 198,) which first authorized courts of equity to allow damages in addition to profits. In considering this aspect of the case, Mr. Justice Bradley, in delivering the opinion of the court, said: "Though the defendant's business be ever so profitable, if the use of the invention has not contributed to the profits none can be recovered. The same result would seem to follow where it is impossible to show the profitable effect of using the invention upon the business results of the party infringing. * * * The party who made the profit by the construction of the pavement in question was the New Jersey Wood Paving Company. The city of Elizabeth made no profit at all. It paid the same for putting down the pavement in question that it was paying to the defendants in error for putting down the Nicholson; but damages are not sought, or, at

least, are not recoverable, in this suit. Profits only, as such, can be recovered therein." The court held that the evidence was that the city and Tubbs, whose only relation to the transaction was the salary he received for superintending the work, made no profits at all. As to the foreign patents relied upon by the defense, it was held that none of them combine the elements, or combination of elements, of Nicholson's, and therefore present no ground for invalidating his patents. As to the other defense, growing out of the alleged public use of Nicholson's pavement for six years before applying for a patent, it appeared that Nicholson, with the consent of the owners of a public road near Boston, had put down some of his new pavement at his own expense, and for experimental purposes only. The learned justice remarked that "the nature of a street pavement is such that it cannot be experimented upon satisfactorily, except on a highway, which is always public," and, further, that "had the city of Boston or other parties used the invention, by laying down the pavement in other streets and places, with Nicholson's consent and allowance, then, indeed, the invention itself would have been in public use, within the meaning of the law; but this was not the case. * * * Nicholson did not let it go beyond his control. He did nothing that indicated any intent to do so. He kept it under his own eyes, and never for a moment abandoned the intent to obtain a patent for it." City of Elizabeth v. American Nicholson Pavement Co., 97 U. S. 126.]

[The patent involved in this litigation, No. 11,491, was granted August 8, 1854, to S. Nicholson, reissued December 1, 1863, No. 1,583, and August 20, 1867, No. 2,748. The first reissue was involved in Nicholson Pavement Co. v. Hatch, Case No. 10.251. The second reissue was involved in the case to which this note is appended, and in Nicholson Pavement Co. v. Jenkins, 14 Wall. (81 U. S.) 452: Jenkins v. Nicholson Pavement Co., Case No. 7,273; Bigelow v. City of Louisville, Id. 1,400.]